**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| TASHA DAVIS LONG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 20-cv-02098 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| STATE OF ILLINOIS DEPARTMENT | ) | |
| OF HUMAN SERVICES, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Tasha Davis Long ("Davis") was hired by the Illinois Department of Human Services ("IDHS") in December 2013 to work as a Social Services Career Trainee ("SST"). Following a series of incidents with her supervisor that Davis believes to have been motivated by racial bias, she resigned in March 2014. She subsequently sued IDHS, alleging discrimination based on race and national origin. Now before the Court is IDHS's motion for summary judgment. (Dkt. No. 36.) For the reasons that follow, the motion is granted in part and denied in part.

**BACKGROUND**

The following facts are taken from the parties' Local Rule 56.1 statements. Where disputed, the Court views the facts in the light most favorable to Davis as the nonmoving party. *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021).

Davis began working for IDHS, a department of the State of Illinois, on December 3, 2013. (Pl.'s Resp. to Def.'s Statement of Facts ("PRDSF") ¶¶ 3–4, Dkt. No. 45.) IDHS hired Davis as an SST at its Kane-Aurora Family Community Resource Center ("Kane-Aurora Facility"), where she would have been a probationary employee for six to twelve months before

becoming a permanent employee. (*Id.* ¶¶ 4–6.) As an SST, Davis's job duties included

interviewing applicants for assistance using a list of questions supplied by IDHS. (*Id.* ¶ 8.) Her

job description also provided that 5% of her time could be spent on "other duties as assigned or

required which are reasonably within the scope of duties enumerated above." (Def.'s Statement

of Facts ("DSF"), Ex. 3 at 2, Dkt. No. 37-3; *see also* PRDSF ¶ 10.)

Davis, a Black woman of American national origin, started work on the same day as two

other Black women of American national origin: Robbie Russell-Booth and Kaitlyn Morris.

(PRDSF ¶¶ 2, 4–5.) Davis had three supervisors at the Kane-Aurora Facility: Vanessa Lopez,

Charles Moon, and Lorena Fellows. (*Id.* ¶ 7.) Lopez and Fellows are Latina women of Puerto

Rican ancestry, both of whom speak Spanish. (Def.'s Resp. to Pl.'s Statement of Additional

Facts ("DRPSAF") ¶¶ 1, 5, Dkt. No. 53.) Davis describes Moon as a White man. (*Id.* ¶ 24.)

Davis admits that she had a negative relationship with Lopez. (PRDSF ¶ 15.) Davis

believed that Lopez treated her poorly because Davis was an ambitious, educated Black woman,

and Lopez saw her as a threat. (*Id.* ¶ 15.) Davis, for her part, felt that Lopez was unprofessional.

(*Id.* ¶ 17.) Russell-Booth was similarly critical of Lopez, who she felt dressed unprofessionally,

was loud, and fraternized with other employees. (*Id.*) Overall, Davis did not consider the Kane-

Aurora Facility to be a "normal working environment," as she thought the other employees were

unprofessional and profane. (*Id.*)

Davis testified that during their orientation, Lopez told Davis, Russell-Booth, and Morris

that nobody should file a complaint against her because she never loses. (*Id.* ¶ 22.) Russell-Booth

initially testified that she interpreted this statement as a joke, but she later qualified that

testimony by explaining that Lopez "kind of laughed when she said it." (DSF, Ex. 5 at 30:21–22,

31:12–13, Dkt. No. 37-5.) Davis considered Lopez's statement "unusual and concerning." (DRPSAF ¶ 7.)

Shortly after Davis started working at the Kane-Aurora Facility, Lopez instructed Davis and Russell-Booth—but not Morris—to clean Moon's office. (PRDSF ¶ 23; DRPSAF ¶¶ 9, 24.) IDHS contends that Davis and Russell-Booth received that assignment because there was no other work for them to do at the time, but Davis disputes that no other work was available. (PRDSF ¶ 23.) While the two women cleaned Moon's office, he told them that "all eyes and ears" were on them—whether or not Lopez was present—and that Lopez had called him and told him to keep an eye on Davis and Russell-Booth while she was out of the office. (PRDSF ¶ 24; DRPSAF ¶¶ 24–25.) Davis interpreted Moon's statement as a threat and contends that Moon also told them to "be careful what you do around here." (PRDSF ¶ 24; DRPSAF ¶ 24.)

Davis also identifies at least one occasion when Lopez assigned her excessive work. In February 2014, Lopez gave Davis nineteen cases in one day. (PRDSF ¶ 25; DRPSAF ¶ 10.) Davis testified that Cathy Richards, an employee responsible for making Lopez's assignments, was in tears when she assigned Davis nineteen cases, telling Davis that she had never seen anything like that before. (DRPSAF ¶ 11.) Davis complained to Lopez that she felt she was being "targeted with an excessive workload while she was a trainee to get rid of her because of her race." (PRDSF ¶ 25.) Indeed, written instructions provided to Davis state that certified case workers conduct four expedited interviews in the morning and four in the afternoon. (DRPSAF ¶ 57; Pl.'s Statement of Additional Facts ("PSAF"), Ex. 3, Dkt. No. 44-4.) However, Davis offers no evidence regarding other employees' workloads, aside from that of an employee named Lourdes who, on that particular day, received three or four cases. (PRDSF ¶¶ 10, 27.) Davis does not provide Lourdes's last name or describe her race or national origin.

In February 2014, Davis overheard a conversation between Lopez and Minnet Ortiz, a Spanish-speaking Puerto Rican case worker at IDHS, that took place in Ortiz's cubicle next to Davis's cubicle. (DRPSAF ¶ 2; PRDSF ¶¶ 18.) During that conversation, Davis overheard Ortiz refer to the new SSTs—*i.e.*, Davis, Russell-Booth, and Morris—using the word "mayate." (PRDSF ¶¶ 18, 21.) Maria Delgado, a Spanish-speaking SST who began working at IDHS in February 2014, told Davis that "mayate" is the Spanish language equivalent to the N-word. (DRPSAF ¶¶ 18–19; PRDSF ¶ 19.) Davis also learned the meaning of the word through Internet searches and by asking Hispanic friends. (PRDSF ¶ 19.) This instance was the only time Davis personally overheard a racial slur in the Kane-Aurora facility, and Davis did not hear Lopez use slurs or otherwise comment on Davis's race or national origin. (*Id.* ¶¶ 18, 21.) But prior to the February 2014 incident, Delgado told Davis that she overheard Ortiz and Mitzy Newell, a Latina, Spanish-speaking IDHS case worker, use the epithet "mayate" on several occasions. (DRPSAF ¶ 29.) Davis told Russell-Booth and Morris about the February 2014 incident, and she informed her union about the discrimination and harassment she was facing. (PRDSF ¶ 20.)

Davis also raises concerns about her overtime and travel reimbursements not being timely approved. As her supervisor, Lopez told Davis which trainings to attend and signed her up for them. (DRPSAF ¶ 31.) The trainings were not always at the Kane-Aurora Facility, so Lopez informed Davis that she was entitled to claim overtime compensation and reimbursement for mileage and travel expenses. (*Id.*) Indeed, the applicable Collective Bargaining Agreement ("CBA") provided for overtime compensation "to all employees required to travel for training, orientation, or professional development when travel is in excess of their normal commute and outside their normal work hours." (*Id.* ¶ 30.) For example, Davis attended a four-day training session at IDHS's Will County office from December 3, 2013 to December 6, 2013, for which

Case: 1:20-cv-02098 Document #: 67 Filed: 08/05/23 Page 5 of 22 PageID #:1026

she traveled to Will County each day and submitted overtime requests for the time from when she left her house until she returned. (PRDSF ¶¶ 37–38.) It is not entirely clear when Davis submitted her overtime requests, but Moon approved them on December 15, 2013. (PRDSF ¶¶ 38–39.) Davis also submitted mileage reimbursement requests for her travel to and from Will County. (*Id.*¶ 40.) She testified that she gave the reimbursement requests to Lopez, who told her to give them to Moon. (DRPSAF ¶ 33.) According to Davis, one of Lopez's responsibilities was to approve such requests. (*Id.*) Although the record is unclear as to whether the requests were ultimately approved or denied, Davis testified that Moon told her that Lopez refused to approve them. (PRDSF ¶ 40; DRPSAF ¶ 33.)

Davis also attended a training in Chicago, approved by Lopez, in January 2014. (PRDSF ¶ 41.) Lopez told Davis that while she did not have to stay in Chicago overnight, she should request reimbursement for any overtime worked or travel costs incurred. (*Id.* ¶ 42.) As with the Will County training, Davis submitted overtime requests that covered the period from when she left her house to when she returned home, as well as mileage reimbursement requests for travel to and from Chicago. (*Id.* ¶¶ 43–44.) It is not clear from the record whether overtime or mileage reimbursements from the Chicago training were ever paid to Davis. IDHS contends that the requests related to Davis's January 2014 training were never approved or denied, but Davis testified that she was told that Lopez refused to approve them. (*Id.* ¶ 44.)

On February 21, 2014, Davis called in sick. (PRDSF ¶ 45.) Russell-Booth and Morris also called in sick on the same day. (*Id.*) Davis claims that she was not paid for the day even though she had available sick time. (DRPSAF ¶ 46.) In response to Davis's sick day, Fellows, who was a Human Services Casework Manager, issued Davis a "Counseling," which appears to be a type of written reprimand. (PRDSF ¶¶ 7, 46.) According to Davis, Lopez thought Davis,

Russell-Booth, and Morris had conspired to call in sick on the same day, and so Lopez instructed

Fellows to issue Davis the Counseling. (DRPSAF ¶¶ 44–45.) But according to IDHS, the CBA

required a doctor's note for a sick day, and Davis did not provide one. (PRDSF ¶ 45.) In fact, the

CBA states that an absence is unauthorized "if 'acceptable certification is not subsequently

provided within five (5) work days.'" (*Id.* ¶ 35 (quoting DSF, Ex. 7 at 218, Dkt. No. 37-7).) And

the Counseling states that Davis failed to produce a doctor's note after being asked twice.

(PRDSF ¶¶ 46–47.) In any case, Davis, Russell-Booth, and Morris refused to "sign-off" on the

Counseling, but Davis did write a response to the Counseling to be lodged in her file. (DRPSAF

¶¶ 46–47.)

Subsequently, around March 11, 2014, Davis's husband required emergency surgery and

so she requested two days off. (PRDSF ¶ 11.) As a probationary employee, Davis was entitled to

use vacation time with her supervisor's approval. (DRPSAF ¶¶ 48, 58; CBA at 35–36.) IDHS

contends, citing Davis's testimony, that she did not have any available vacation time when she

made the request. (PRDSF ¶ 12.) For her part, Davis claims that he was not paid for a vacation

day she took on March 5, 2014, despite her request having been approved (although IDHS

disputes that approval was given). (DRPSAF ¶ 49.) Outside of vacation days, the CBA entitles

employees who are eligible for leave under the Family Medical Leave Act ("FMLA") to request

temporary leave in writing, among other things, to care "for a temporarily disabled,

incapacitated, or bedridden resident of the employee's household." (*Id.* ¶ 56.) But IDHS asserts

that, as a trainee, Davis was not eligible for FMLA benefits or covered by that provision of the

CBA. (*Id.*) And the IDHS Handbook states that employees who "have a minimum of 12 months

of State service" are eligible for FMLA leave. (IDHS Handbook at 29.) At the time Davis

requested leave, she had worked at IDHS for approximately three months. (*See* DRPSAF ¶ 35 (stating that Davis began working at IDHS in December 2013).)

Davis testified that Lopez told her she would be terminated if she took two days off for her husband's surgery (PRDSF ¶ 11; DRPSAF ¶ 51.) The parties dispute whether Davis was entitled to time off when she made her request—IDHS contends that Davis was not eligible for any time off, while Davis asserts that Lopez had the authority to order additional time off under the CBA. (PRDSF ¶ 12.) Davis acknowledged in her deposition, however, that she could not name another SST who had been allowed to take time off in similar circumstances. (*Id.*)

Davis resigned on March 12, 2014, with an effective date of March 15, 2014. (*Id.* ¶ 15.) In her letter of resignation, Davis states that she is resigning because she has been told that as a new trainee she is not eligible for leave to address her family emergency; by resigning instead of being terminated, she hoped to remain in good standing as an employee and did not want a discharge on her record to affect future employment opportunities. (PRDSF ¶ 13; DRPSAF ¶ 52; DSF, Ex. 4, Dkt. No. 37-4.) According to Davis, she resigned "because conditions working for [IDHS] had become intolerable and Lopez threatened to fire her if she took time off to help her husband who needed emergency surgery." (PRDSF ¶ 14.) Davis claims that she was prompted to resign by a series of events including: overhearing Lopez, Fellows, and Ortiz using or allowing the use of a racial slur; Lopez's refusal to reimburse Davis's travel vouchers and to pay for overtime and vacation days; Lopez instructing Davis to perform the demeaning and difficult work of cleaning a supervisor's office; and Davis being subjected to threats, scrutiny, overwork, and lack of training—all of which led her to believe that her termination was imminent. (*Id.*)

The IDHS Handbook addresses the role of employees and supervisors regarding discrimination and harassment as follows:

> It is the responsibility of all supervisors and managers of [IDHS] to address all observed or reported incidents or complaints of discrimination and/or harassment by taking appropriate and prompt action to investigate, report, and terminate all such incidents. . . . It is the responsibility of all employees to refrain from discrimination and harassment in the workplace. Any employee who discriminates or harasses a fellow worker will be held accountable for his or her individual conduct.

(DRPSAF ¶ 55; DSF, Ex. 6 at 57, Dkt. No. 37-6.) Moreover, Davis unsuccessfully sought assistance from her union in response to the alleged harassment and discrimination; she was told that the union could not help her because she was an SST. (DRPSAF ¶ 50.)

In August 2014, Davis filed a charge of discrimination ("Charge") with the Illinois Department of Human Rights ("IDHR"), alleging discrimination on the basis of her race and ancestry, as well as retaliation. (PRDSF ¶ 48.) In her charge, she references discrimination in the forms of harassment, being subjected to different terms and conditions of employment, being issued a written warning, and constructive discharge. (*Id.* ¶ 49.) Davis received her Notice of Right to Sue on January 27, 2020 (*see* Compl., Ex A. Dkt. No. 1-1.), and she timely filed this lawsuit on April 2, 2020. Her complaint asserts four counts against IDHS, all arising under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* Counts I and II assert claims for race and national origin discrimination, respectively, each based on a hostile work environment theory. Counts III and IV assert claims for constructive discharge due to race and national origin, respectively.

## DISCUSSION

When faced with a summary judgment motion, the Court must determine if a genuine dispute of material fact exists such that a reasonable jury could return a verdict for the nonmoving party. *Stokes v. Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 619 (7th Cir. 2010). The Court's function at the summary judgment stage is to determine whether there is a genuine issue for trial, not to make determinations of truth or to weigh evidence. *Austin v. Walgreen Co.*,

885 F.3d 1085, 1087 (7th Cir. 2018). Accordingly, the Court must avoid "the siren song that tempts [it] into making factual determinations at the summary judgment stage." *Gupta v. Melloh*, 19 F.4th 990, 996 (7th Cir. 2021). Moreover, in deciding whether there is a genuine issue, the Court must construe all facts and reasonable inferences from them in the light most favorable to the nonmovant. *Nischen v. Stratosphere Quality, LLC*, 865 F.3d 922, 928 (7th Cir. 2017).

## I.      Proper Scope of Davis's Claims

The Court first addresses the scope of Davis's claims. In her response brief, Davis for the first time advances a theory of color discrimination in addition to her claims of race and national origin discrimination. Briefly, Davis contends that Lopez told Morris that she would become certified quickly and that, unlike Davis, Morris was not asked to perform the menial task of cleaning and organizing Moon's office. Davis posits that Morris was treated better than her due to Morris's lighter skin color. In its reply brief, IDHS argues that any claim for color discrimination falls outside the scope of the Charge and complaint, and therefore, Davis cannot proceed on any such claim.

A Title VII plaintiff may pursue in court only those claims that were included in her administrative charge or that are "like or reasonably related to the allegations of the charge and growing out of the allegations." *Geldon v. S. Milwaukee Sch. Dist.*, 414 F.3d 817, 819 (7th Cir. 2005) (internal quotation marks omitted). That means a plaintiff may bring a Title VII claim only if there is a reasonable relationship between the allegations in the administrative charge and the claims in the complaint, and the claims in the complaint could reasonably have been expected to grow out of an investigation of the allegations in the administrative charge. *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 501 (7th Cir. 1994). "The rule is meant both to give the [administrative agency] and employer an opportunity to settle the dispute and to give the employer fair notice of the conduct about which the employee is complaining." *Geldon*, 414 F.3d at 819. When

assessing whether a complaint falls within the scope of an administrative charge, the question is not whether the former duplicates the latter. Rather, it is whether the allegations in the charge and the complaint that is subsequently filed "describe the ***same conduct*** and implicate the ***same individuals***." *Cheek*, 31 F.3d at 501; *see also Chaidez v. Ford Motor Co.*, 937 F.3d 998, 1004–05 (7th Cir. 2019).

Here, the Charge states that Davis suffered discrimination due to her "RACE, BLACK" and "ANCESTRY, AMERICAN." (DSF, Ex. 10, Dkt. No. 37-10.) It does not mention discrimination based on color or otherwise indicate that Davis was treated differently than Morris or any other co-worker of lighter skin color. Nonetheless, the Court finds that there is a reasonable relationship between the allegations in the Charge and the claim of color discrimination described in Davis's response brief, and that the claim of color discrimination in the response brief could reasonably have been expected to grow out of an investigation of the Charge. Notably, the Charge concerns alleged discrimination by Lopez and includes allegations that Lopez assigned Davis to clean Moon's office when other SSTs were not required to perform that work. Those events also form the basis for the color discrimination claim suggested in Davis's response brief. Accordingly, an investigation of Davis's Charge reasonably would have led to consideration of the alleged color discrimination, as the conduct and individuals involved are the same. In addition, while the Charge itself does not allege that Davis was treated worse than Morris due to their respective skin colors, letters sent to the IDHR during its investigation by Russell-Booth and Morris do. (PSAF, Ex. 5 at 1, Dkt. No. 44-6 ("Due to Tasha and myself being of a darker complexion we were made to file papers in Supervisor Mr. Moon's office."); PSAF, Ex. 6 at 1, Dkt. No. 44-7 ("Based on my light color, I was trained . . . . However, Tasha Davis-Long and Robbie Russell Booth [*sic*] were not trained due to their dark color.").) Thus, it

appears that the IDHR actually obtained information relating to the alleged color discrimination in the course of investigating the Charge. Accordingly, the color discrimination suggested in Davis's brief is reasonably related to the race and national origin discrimination expressly raised in the Charge.

But even though Davis could have asserted a claim for color discrimination in this lawsuit, the complaint she filed does not do so. In her complaint, Davis does not allege—or even suggest—any claim that she was treated differently than other SSTs because of her darker skin color, as distinguished from her race. Specifically, she does not allege any incident when she was treated differently than Morris (described in the summary judgment record as a Black SST with a lighter skin tone than Davis), instead comparing her treatment only to that of non-Black employees. Davis does not allege any color-based motivation for the assignment to clean Moon's office even though that cleaning assignment is mentioned in the complaint as an example of a situation in which she and another Black SST were treated poorly because both are Black. Meanwhile, Morris is referenced just once in the complaint: when Davis lists the two other Black American SSTs who began work at the Kane-Aurora Facility on the same day that she did. (*See* Compl. ¶ 11, Dkt. No. 1.) Thus, IDHS was not on notice from Davis's complaint that she sought to raise a color discrimination claim. And Davis cannot amend her complaint to claim color discrimination through statements in her brief in opposition to summary judgment. *See Shanahan v. City of Chi.*, 82 F.3d 776, 781 (7th Cir. 1996); *see also EEOC v. Lee's Log Cabin, Inc.*, 546 F.3d 438, 443 (7th Cir. 2008). Accordingly, the Court will not consider Davis's arguments relating to color discrimination.

## II.        Hostile Work Environment (Counts I and II)

The Court next turns to the claims raised in Davis's complaint. Title VII prohibits employers from discriminating against employees based on race, color, religion, sex, or national origin. *See* 42 U.S.C. § 2000e-2(a)(1). In assessing Title VII claims at the summary judgment stage, this Court considers "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). In general, three types of employment actions can constitute adverse employment actions:

> (1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge.

*West v. Radtke*, 48 F.4th 836, 849 (7th Cir. 2022) (internal quotation marks omitted).

Davis relies on a hostile work environment theory to establish her race and national origin discrimination claims in Counts I and II. To prove a hostile work environment claim, a plaintiff must show (1) she was subject to unwelcome harassment, (2) the harassment was based on a protected characteristic, (3) "the harassment was severe or pervasive to a degree that altered the conditions of employment and created a hostile or abusive work environment," and (4) a basis for employer liability. *Robinson v. Perales*, 894 F.3d 818, 828 (7th Cir. 2018). Considering these factors, the Court finds that Davis has demonstrated a genuine issue of fact for trial with respect to her claim that she suffered a hostile work environment based on her race but not on the basis of her national origin.

### A.      Unwelcome Harassment Based on Race or National Origin

For present purposes, the Court takes the first two hostile work environment factors together to determine whether Davis has put forward sufficient evidence that she experienced unwelcome harassment based on her race or national origin.

Davis identifies the following unwelcome harassment that she suffered while working as an SST at the Kane-Aurora Facility: (i) co-workers referred to Davis using a racial slur with the tacit approval of her supervisor, Lopez; and (ii) Lopez engaged in a barrage of workplace offenses against Davis, including failing to train her, giving her excessive work, refusing to authorize her reimbursement forms, instructing her to clean Moon's office, warning her and other SSTs not to file a complaint, and denying her vacation time. In response, IDHS argues that Davis misconstrues her interactions with Lopez, which IDHS contends were merely the "'ordinary tribulations of the workplace.'" (IDHS Reply at 7, Dkt. No. 52 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).). But that benign characterization of Lopez's actions toward Davis divorces them from Davis's claim that she overheard a coworker refer to her using a racial slur when speaking with Lopez, who did not take any corrective action or react negatively in any way. A reasonable juror could view Lopez's lack of reaction to the racial slur as indicating her approval of such language to describe Davis. And as a supervisor, Lopez's acceptance of the racial slur when talking about Davis transforms their working relationship and sheds light on their other interactions. *See, e.g.*, *Robinson*, 894 F.3d at 828 (emphasizing that a supervisor's, not a co-worker's, use of a slur is of particular importance); *Gates v. Bd. of Educ. of the City of Chi.*, 916 F.3d 631, 638–39 (7th Cir. 2019) (discussing how use of the N-word can cause a working environment to deteriorate rapidly).

Specifically, Lopez's acceptance of the racial slur in discussing Davis with other employees could lead a reasonable juror to conclude that Lopez's treatment of Davis was harassment motivated by race-based animus. Perhaps a reasonable juror would nonetheless find that Lopez asked Davis to clean Moon's office, for example, because there was no other work to do that day. But alongside the racial slur and other alleged poor treatment, a reasonable juror could also find that Lopez's request was part of a pattern of harassment motivated by race-based animus. Lopez chose two Black women to organize Morris's office rather than find them work more closely related to the jobs for which IDHS hired them. Those two women were of the same race towards which Lopez tolerated slurs and failed to act, contrary to the Handbook's directive that she do so. At the summary judgment stage, where the evidence and all reasonable inferences from it must be viewed in the light most favorable to Davis, she has done enough to demonstrate a triable issue of fact as to whether she suffered unwelcome harassment due to her race.

The same cannot be said of Davis's claim that she suffered unwelcome harassment due to her national origin, however. The only evidence arguably suggesting national origin as a basis for differential treatment involves Delgado—who is described as being non-Black and non-American (Compl. ¶ 13(e))—not Davis. (DRPSAF ¶ 22 ("During Delgado's employment, Lopez and Ortiz expressed disappointment that Delgado was not Puerto Rican.").) That Spanish-speaking employees used Spanish language slurs rather than English language slurs when discussing Davis is not enough to suggest that the motivating factor for their animus was national origin as opposed to race. As a result, Davis's claim that she suffered a hostile work environment based on her national origin cannot survive summary judgment. Summary judgment is therefore granted as to Count II.

### B.    Severe or Pervasive

To establish her race-based hostile work environment claim, Davis must also show that the unwelcome harassment she suffered was severe or pervasive. "[C]ourts consider the totality of the circumstances when determining whether conduct is severe or pervasive." *Scaife v. U.S. Dep't of Veterans Affs.*, 49 F.4th 1109, 1116 (7th Cir. 2022). Relevant factors include (1) the frequency of the discriminatory conduct; (2) how offensive a reasonable person would deem it to be; (3) whether it included physically threatening or humiliating conduct as opposed to verbal abuse; (4) whether it unreasonably interferes with an employee's work performance; and (5) whether it is directed at the victim. *Id.* at 1116.

IDHS argues that the unwelcome harassment Davis claims to have suffered was not sufficiently severe or pervasive to rise to the level of a hostile workplace as a matter of law. According to IDHS, each instance when Lopez allegedly mistreated Davis was nothing more than an ordinary workplace trial or tribulation. IDHS further contends that Davis only heard a coworker describe her using a racial slur one time, she did not know what the word meant until afterwards, and Russell-Booth's and Delgado's testimony that Ortiz had used the slur on at least four other occasions is nothing more than hearsay.

In this case, the unwelcome harassment about which Davis complains consisted of multiple incidents over a period of approximately three months. While Davis does not allege that she was physically threatened, she does claim humiliating conduct in addition to verbal abuse (*i.e.*, the racial slur). When considering the offensiveness of the conduct, the humiliation Davis claims to have suffered, and whether the conduct interfered with Davis's ability to perform her work, the use of a racial slur to refer to Davis in her presence and with the tacit approval of her supervisor is particularly significant. "While there is no 'magic number' of slurs that indicate a

hostile work environment, [the Seventh Circuit] ha[s] recognized before that an unambiguously racial epithet falls on the 'more severe' end of the spectrum." *Cerros v. Steel Tech., Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002). And because the English version of the racial slur Davis claims she heard is so egregious, the Seventh Circuit has advised that courts need not focus on the number of times the epithet is used. *See Scaife*, 49 F.4th at 1116. "Perhaps no single act can more quickly 'alter the conditions of employment and create an abusive working environment' than the use of an unambiguously racial epithet . . . by a supervisor in the presence of his subordinates." *Rodgers v. Western-Southern Life Inc. Co.*, 12 F.3d 668, 675 (7th Cir. 1993). Although Lopez herself did not use the racial epithet in Davis's presence, as a supervisor, Lopez's acquiescence to the use of such language by one subordinate employee with respect to another subordinate employee achieves a comparable result. In its reply brief, IDHS dismisses each incident between Davis and Lopez as a quotidian disagreement, and then addresses Lopez's toleration of the racial epithet as though it were the sole concerning act. But the series of alleged harassing acts by Lopez must be considered in the context of the racial slur. Viewed individually, Lopez's actions toward Davis might not be considered severe. But "considering the entire context of the workplace," a reasonable juror could conclude that they do rise to that level. *Cerros*, 288 F.3d at 1046.

### C.    Employer Liability

Finally, the Court considers whether Davis has put forward a basis to impose employer liability. "In determining whether there is a basis for employer liability, the court must first decide whether the alleged harassment was perpetrated by supervisors or coworkers. If the harasser was the plaintiff's supervisor, then the employer is strictly liable for the harassment. If the harasser was merely a coworker, the employer is liable only if it was negligent either in

discovery or remedying the harassment." *Elliott v. Bd. of Education of City of Chi.*, 20 C 2706, 2022 WL 874649, at *6 (N.D. Ill. Mar. 24, 2022). In this case, Davis claims that she was harassed primarily by Lopez, who was her supervisor, and therefore the IDHS is subject to a strict liability standard. *Faragher v. City of Boca Raton,* 524 U.S. 775, 798–800 (1998) (explaining rationale for employer liability for harassment committed by a supervisor against an employee); *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1034 (7th Cir. 1998) (explaining that an employer is vicariously liable for harassment by "true supervisors," who are more than mere low-level supervisors "and who possess the authority to hire, fire, demote, promote, transfer, or discipline an employee"). Notably, IDHS asserts in its own Rule 56.1 Statement of Material Facts that Lopez was one of Davis's supervisors and that "Lopez supervised the entire Kane-Aurora facility." (PRDSF ¶ 7.) Thus, the characterization of Lopez as Davis's supervisor appears undisputed. But to the extent there is nonetheless a disputed issue of fact as to Lopez's supervisory status, that dispute must be resolved in Davis's favor at the summary judgment stage.

IDHS contends that it cannot be held liable for any harassment Davis suffered because she did not file a complaint with the IDHS Bureau of Civil Affairs ("BCA"), which is the prescribed mechanism for resolving discrimination complaints set forth in the IDHS Handbook. According to IDHS, Davis's failure to follow the prescribed procedure insulates it from liability because it did not have the opportunity to address Davis's complaints through its own procedures. Indeed, it is generally true that "[a]n employer is not liable for **co-employee** racial harassment when a mechanism to report the harassment exists, but the victim fails to utilize it." *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 549 (7th Cir. 2011) (internal quotation marks

omitted) (emphasis added). And IDHS's Handbook directs an employee who has experienced

discrimination or harassment to report their concerns to the BCA, stating that:

> An employee or applicant who either observes or believes himself or herself to be
> the object of discrimination or harassment should immediately contact the DHS
> Bureau of Civil Affairs for consultation or to file a written internal charge, without
> fear of retaliation. ***Written internal charges should be filed within 30 days of the
> alleged incident.*** An employee or applicant also has the right to file an external
> charge with the Illinois Department of Human Rights, the U.S. Department of
> Health and Human Services, with the Department of Justice (within 180 calendar
> days of the alleged discrimination or harassment), or the U.S. Equal Employment
> Opportunity Commission (within 300 calendar days of the alleged incident).
> ***External charges may be filed regardless of whether a written internal charge
> has also been filed.***

(IDHS Handbook at 57 (emphasis added).) There is an exception to the reporting requirement:

"[a] complainant . . . need not specifically comply with the company's internal procedure if the

employer is adequately put on notice of the prohibited harassment." *Yancick*, 653 F.3d at 549.

Adequate notice requires that "the alleged harassment 'must either [] come to the attention of

someone who (a) has under the terms of his employment, or (b) is ***reasonably believed*** to

have . . . a duty to pass on the information to someone within the company who has the power to

do something about it.'" *Elliott*, 2022 WL 874649, at *7 (quoting *Young v. Bayer Corp.*, 123

F.3d 672, 674 (7th Cir. 1997)) (emphasis in *Elliott*).

     While Davis testified that she spoke to her union about the harassment she claims to have

endured, there is no indication in the record that she contacted the BCA. As noted above,

however, it is at least disputed (if not actually admitted by IDHS) that Lopez was Davis's true

supervisor and thus the standard for co-employees cited by IDHS does not apply. Moreover,

even under IDHS's preferred standard, there is at least a disputed issue of fact as to whether

Lopez had a duty to "address all observed or reported incidents or complaints of discrimination

and/or harassment by taking appropriate and prompt action to investigate, report, and terminate

all such incidents." (IDHS Handbook at 57.) In other words, she "ha[d] the power to do

18

something about it." *Young*, 123 F.3d at 674. That is enough to establish a basis for employer liability.

In sum, Davis has demonstrated the existence of a triable issue of fact for trial on her race-based hostile work environment claim in Count I. However, with respect to the hostile work environment claim based on national origin in Count II, summary judgment is granted.

### III.   Constructive Discharge (Counts III and IV)

Counts III and IV of Davis's complaint assert claims for constructive discharge based on race and national origin, respectively. A constructive discharge occurs when "the plaintiff shows that she was forced to resign because her working conditions, from the standpoint of the reasonable employee, had become unbearable." *Fischer v. Avanade, Inc.*, 519 F.3d 393, 409 (7th Cir. 2008) (internal quotation marks omitted). The Seventh Circuit "has recognized two different forms of constructive discharge, but neither dispenses with the requirement that the work environment had become intolerable." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010). For the first form, where the employee "resigns due to alleged discriminatory harassment," the plaintiff must "show working conditions even more egregious than that required for a hostile work environment claim because employees are generally expected to remain employed while seeking redress, thereby allowing an employer to address a situation before it causes the employee to quit." *Wright v. Ill. Dept. of Child. & Fam. Servs.*, 798 F.3d 513, 527 (7th Cir. 2015) (internal quotation marks omitted). In contrast, the second form "occurs when an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated." *Id.* (internal quotation marks omitted). Regardless of which form of constructive discharge she invokes, Davis has failed to demonstrate a genuine issue of fact for trial.

Davis relies on the same evidence that underlies her hostile work environment claims to establish constructive discharge. As discussed above, however, those facts cannot support a reasonable inference that Davis was subjected to a hostile work environment based on her national origin. So she is likewise unable to prove constructive discharge based on national origin, which involves a higher standard. *See Scaife*, 49 F.4th 1119. Accordingly, IDHS is entitled to summary judgment with respect to the national origin claim in Count IV.

With respect to the race-based constructive discharge claim in Count III, Davis relies primarily on the second form of constructive discharge: that "the handwriting was on the wall and the axe was about to fall." *Fischer*, 519 F.3d at 409 (internal quotation marks and alterations omitted). To prevail based on this theory, "a plaintiff must show that she was forced to resign because her working conditions became so intolerable that a reasonable person would have felt compelled to resign." *Scaife*, 49 F.4th at 1119 (internal quotation marks and alterations omitted). Here, Davis claims that Lopez told her that she would be terminated if she took two days off to address her husband's health problems. (DRPSAF ¶ 51.) Davis may meet her burden of showing that this constituted constructive discharge if she "demonstrate[s] that a reasonable employee standing in [her] shoes would have believed that had she not resigned, she would have been terminated." *EEOC v. Univ. of Chi. Hosps.*, 276 F.3d 326, 332 (7th Cir. 2002).

IDHS contends that Davis's termination was not imminent but at most conditional—she only faced the threat of termination if she decided to take two unapproved days off and the decision whether to do so was in her own hands. In *EEOC v. University of Chicago Hospitals*, by contrast, there was no indication that the employee had any real choice; she arrived to work to find that "her belongings were packed and her office was being used for storage." *Id.* at 332.

In this case, Davis could have accepted the decision not to grant her request for two days off and kept her job. Because Davis had the option not to take two days off, a reasonable employee would not have felt that had she not resigned, she would have been terminated. Indeed, in her resignation letter, Davis wrote that she decided to resign rather than be terminated "[a]fter careful consideration," in order to remain in good standing. (DSF, Ex. 4.)

The Seventh Circuit has recognized a number of ways in which a plaintiff may provide sufficient evidence to defeat summary judgment on a constructive discharge claim, such as showing evidence of serious physical threats or "a repeated pattern of offensive conduct by her supervisor, retaliatory actions after she complained to human resources, and her employer's general failure to respond despite repeated complaints." *Stamey v. Forest River, Inc.*, 37 F.4th 1220, 1225 (7th Cir. 2022) (internal quotation marks omitted). Here, however, Davis has offered no evidence of physical threats or retaliatory actions. There is a pattern of conduct that plausibly gives rise to a hostile workplace, but constructive discharge requires "working conditions even more egregious than that required for a hostile work environment claim." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010). Lopez's threat of termination did not put the writing on the wall as clearly as, for example, coming in to the office to find one's belongings packed and office used for storage. *Univ. of Chi. Hosps.*, 276 F.3d at 332. Also significant is that lack of any formal complaints lodged by Davis. *See, e.g.*, *Stamey*, 37 F.4th at 1225 ("An employee who, though not in immediate danger, quits without notifying the employer of the egregious harassment has acted unreasonably and has not been constructively discharged."); *Musa-Muaremi v. Florists' Transworld Delivery, Inc.*, No. 09 C 1824, 2011 WL 4738520, at *16 (N.D. Ill. Oct. 5, 2011); *Acosta v. Valley View Dental Ctr. P.C.*, No. 05 C 2571, 2008 WL 4371309, at *3–5 (N.D. Ill. Feb. 27, 2008). Davis confronted Lopez publicly once, made

Case: 1:20-cv-02098 Document #: 67 Filed: 08/05/23 Page 22 of 22 PageID #:1043


unspecified and informal complaints to Moon on three occasions, complained once to her union—who could not help her—and then quit. The facts do not rise to the level where no reasonable employee would continue working at IDHS. *See Scaife*, 49 F.4th at 1119.

In sum, even viewed in the light most favorable to Davis, no reasonable juror could find that she was constructively discharged, either on the basis of her race or her national origin.

## CONCLUSION

For the foregoing reasons, IDHS's motion for summary judgment (Dkt. No. 36) is denied as to Count I and granted as to Counts II, III, and IV.

ENTERED:

Dated: August 5, 2023

Andrea R. Wood
United States District Judge